**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**November 7, 2014**

**TENTH CIRCUIT**

---

KRIS W. KOBACH, Kansas Secretary of
State; KEN BENNETT, Arizona
Secretary of State; STATE OF KANSAS;
STATE OF ARIZONA,

     Plaintiffs - Appellees,

v.

UNITED STATES ELECTION
ASSISTANCE COMMISSION; ALICE
MILLER, in her capacity as acting
Executive Director and Chief Operating
Officer of the United States Election
Assistance Commission,

     Defendants - Appellants,

and

INTER TRIBAL COUNCIL OF
ARIZONA, INC.; ARIZONA
ADVOCACY NETWORK; LEAGUE OF
UNITED LATIN AMERICAN
CITIZENS ARIZONA; STEVE
GALLARDO; PROJECT VOTE, INC.;
LEAGUE OF WOMEN VOTERS OF
THE UNITED STATES; LEAGUE OF
WOMEN VOTERS OF ARIZONA;
LEAGUE OF WOMEN VOTERS OF
KANSAS; VALLE DEL SOL;
SOUTHWEST VOTER

Nos. 14-3062 and 14-3072

REGISTRATION EDUCATION
PROJECT; COMMON CAUSE;
CHICANOS POR LA CAUSA, INC.;
DEBRA LOPEZ,

      Defendant Intervenors -
      Appellants.

------------------------------

REPRESENTATIVES NANCY PELOSI,
STENY H. HOYER, JAMES E.
CLYBURN, XAVIER BECERRA,
MARCIA L. FUDGE, RUBEN
HINOJOSA, JUDY CHU, ROBERT A.
BRADY; ROCK THE VOTE; VOTO
LATINO; PROTECTING ARIZONA'S
FAMILY COALITION; NONPROFIT
VOTE; FAIR SHARE EDUCATION
FUND; FAIR SHARE; AMERICAN
UNITY LEGAL DEFENSE FUND;
ALLIED EDUCATIONAL
FOUNDATION; JUDICIAL WATCH,
INC.; EAGLE FORUM EDUCATION &
LEGAL DEFENSE FUND; THE
STATES OF GEORGIA AND
ALABAMA,

      Amici Curiae.

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:13-CV-04095-EFM-TJJ)**

Bonnie I. Robin-Vergeer (Jocelyn Samuels, Acting Assistant Attorney General, and
Diana K. Flynn and Sasha Samberg-Champion, attorneys, with her on the briefs), United
States Department of Justice Civil Rights Division - Appellate Section, Washington,
D.C., for the Defendants-Appellants.

Kris W. Kobach, Secretary of State of Kansas (Thomas E. Knutzen and Caleb D. Crook, Kansas Secretary of State's Office, Topeka Kansas; Thomas C. Horne, Attorney General of Arizona and Michele L. Forney, Arizona Attorney General's Office, Phoenix, Arizona; and Derek Schmidt, Attorney General of Kansas and Stephen R. McAllister and Jeffrey A. Chanay, Kansas Attorney General's Office, Topeka, Kansas, with him on the brief), Kansas Secretary of State's Office, Topeka, Kansas for the Plaintiffs-Appellees.

Susan Davies, Jonathan Janow, and Rachel B. Funk, Kirkland & Ellis LLP, Washington, D.C.; Michael C. Keats, Bonnie L. Jarrett, and Adam Teitcher, Kirkland & Ellis LLP, New York, New York; David G. Seely, Fleeson, Gooing, Coulson & Kitch LLC, Wichita, Kansas; and Wendy R. Weiser, Tomas Lopez, and Jonathan Brater, Brennan Center for Justice at NYU School of Law, New York, New York, Michelle Kanter Cohen, Project Vote, Inc., Washington, D.C.; Lee Thompson, Erin C. Thompson, Thompson Law Firm, LLC, Wichita, Kansas; and Robert N. Weiner, John A. Freedman, Andrew W. Beyer, and Andrew Treaster, Arnold & Porter, LLP, Washington, D.C.; Nina Perales, Ernest Herrera, Mexican American Legal Defense and Education Fund, San Antonio, Texas; Jeffrey J. Simon and Judd M. Treeman, Husch Blackwell LLP, Kansas City, Missouri; Linda Smith, Adam P. KohSweeney, and J. Jorge deNeve, O'Melveny & Myers LLP, Los Angeles, California; Lane Williams and Kip Elliot, Disability Rights Center of Kansas, Topeka, Kansas; Mark A. Posner and Erandi Zamora, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; Linda Stein, Errol R. Patterson, and Jason A. Abel, Steptoe & Johnson, LLP, Washington, D.C.; Joe P. Sparks, Laurel A. Herrmann, and Julia M. Kolsrud, The Sparks Law Firm, P.C., Scottsdale, Arizona; David B. Rosenbaum, Thomas L. Hudson, and Anna H. Finn, Osborn Maledon, P.A., Phoenix, Arizona; and Daniel B. Kohrman, AARP Foundation Litigation, Washington, D.C., submitted a brief on behalf of Intervenors-Appellants League of Women Voters of the United States, League of Women Voters of Arizona, League of Women Voters of Kansas, Project Vote, Inc., Southwest Voter Registration Education Project, Common Cause, Chicanos Por La Causa, Inc., Debra Lopez, and Inter Tribal Council of Arizona, Inc., Arizona Advocacy Network, League of United Latin American Citizens Arizona, and Steve Gallardo.

Nina Perales, Ernest Herrera, Mexican American Legal Defense and Education Fund, San Antonio, Texas; Jeffrey J. Simon and Judd M. Treeman, Husch Blackwell LLP, Kansas City, Missouri; Linda Smith, Adam P. KohSweeney, and J. Jorge deNeve, O'Melveny & Myers LLP, Los Angeles, California,  submitted a brief on behalf of Intervenor-Appellant Valle Del Sol.

Bradley J. Schlozman, Hinkle Law Firm, LLC, Wichita, Kansas, and Robert D. Popper and Chris Fedeli, Judicial Watch, Inc., Washington, D.C., filed an amicus curiae brief for Judicial Watch, Inc. and Allied Educational Foundation.

3

Lawrence J. Joseph, Washington, D.C., filed an amicus curiae brief for Eagle Forum Education & Legal Defense Fund.

Edith Hakola, American Unity Legal Defense Fund, Warrenton, Virginia, and Barnaby Zall, Weinberg, Jacobs Tolani, Bethesda, Maryland, filed an amicus curiae brief for American Unity Legal Defense Fund.

Luther Strange, Alabama Attorney General, Samuel S. Olens, Georgia Attorney General, and Dennis Dunn, Deputy Attorney General, Georgia Department of Law, Atlanta, Georgia, Montgomery, Alabama, filed an amicus curiae brief for the States of Georgia and Alabama.

Karl J. Sandstrom, Perkins Coie, LLP, Washington, D.C., and Joshua L. Kaul, Perkins Coie, LLP, Madison, Wisconsin, filed an amicus curiae brief for Representatives Nancy Pelosi, Steny H. Hoyer, James E. Clyburn, Xavier Becerra, Marcia L. Fudge, Ruben Hinojosa, Judy Chu, and Robert A. Brady.

Stuart C. Naifeh, Demos, New York, New York, and Brenda Wright and Lisa J. Danetz, Demos, Brighton, Massachusetts, filed an amicus curiae brief for Community Voter Registration Organizations.

---

Before **LUCERO**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Arizona Secretary of State Ken Bennett and Kansas Secretary of State Kris Kobach sought, on behalf of their respective states, that the Election Assistance Commission ("EAC") add language requiring documentary proof of citizenship to each state's instructions on the federal voter registration form ("Federal Form"). The EAC concluded that the additional language was unnecessary and denied their requests. After Kobach and Bennett filed suit challenging the EAC's decision, the district court

4

concluded that the agency had a nondiscretionary duty to grant their requests. We hold that the district court's conclusion is in error in that it is plainly in conflict with the Supreme Court's decision in Arizona v. Inter Tribal Council of Arizona, Inc., 133 S. Ct. 2247 (2013) (ITCA). Were the agency's duty "nondiscretionary," the ITCA majority would have so concluded and arrived at an opposite result. This would, of course, have rendered the Court's suggested option of Administrative Procedure Act ("APA") appellate review both unnecessary and inapplicable. It would also have made the Justice Thomas dissenting opinion endorsing the theory Arizona and Kansas bring to us in this appeal the majority not the dissent. This is one of those instances in which the dissent clearly tells us what the law is not. It is not as if the proposition had not occurred to the majority of the Court. Applying traditional APA review standards, our thorough reading of the record establishes that Kobach and Bennett have failed to advance proof that registration fraud in the use of the Federal Form prevented Arizona and Kansas from enforcing their voter qualifications. Exercising jurisdiction under 28 U.S.C. § 1291, we therefore reverse the grant of judgment favoring Kobach and Bennett, and remand with instructions to vacate.

**I**

The present appeal is the latest installment in a long-running dispute over the Federal Form. In 2004, Arizona passed Proposition 200, which requires documentary proof of citizenship for voter registration. On December 12, 2005, Arizona asked the EAC to add language to the Federal Form's state-specific instructions indicating a

documentary proof of citizenship requirement. The EAC's Executive Director denied the request, leading Arizona to ask the EAC commissioners to reconsider the denial. By a 2-2 vote, the commissioners effectively confirmed the Executive Director's denial.

Meanwhile, various organizations and individuals, many of them Intervenor-Appellants in this case, challenged Proposition 200 in federal court. Their suit culminated in the Supreme Court holding that the National Voter Registration Act ("NVRA") "precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself." ITCA, 133 S. Ct. at 2260. Anticipating this case, the Court stated: "Arizona may, however, request anew that the EAC include such a requirement among the Federal Form's state-specific instructions, and may seek judicial review of the EAC's decision under the [APA]." Id.

 Just two days after the ITCA decision, Arizona again asked the EAC to include documentary proof of citizenship language as a state-specific instruction on the Federal Form. Kansas, which had enacted legislation similar to Proposition 200, made a similar contemporaneous request. Both petitions were deferred on the basis that the EAC lacked a quorum of commissioners. Kobach and Bennett then sued the EAC in the U.S. District Court for the District of Kansas, alleging that the EAC's failure to act violated the APA and that the NVRA is unconstitutional as applied. The district court ordered the EAC to issue a final agency action by January 17, 2014.

After receiving and reviewing 423 public comments, including comments from Arizona, Kansas, and each of the Intervenor-Appellants, the EAC's Executive Director

issued a memorandum on January 17, 2014, denominated as final agency action, denying the states' requests. Kobach and Bennett then renewed their previous demand for relief. This request was granted by the district court and the EAC was ordered to add the subject language to the Federal Form on the district court's conclusion that the NVRA did not preempt state laws requiring proof of citizenship, and that the EAC had a nondiscretionary duty to grant Kobach's and Bennett's petitions. We stayed the order. The merits appeal is now before us.

## II

We review questions of statutory interpretation de novo. United States v. Porter, 745 F.3d 1035, 1040 (10th Cir. 2014). Likewise, we review district court decisions under the APA de novo. Forest Guardians v. U.S. Forest Serv., 641 F.3d 423, 428 (10th Cir. 2011). Our de novo review includes the question of whether an agency acted within the scope of its authority. Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1227 (10th Cir. 2011).

The arguments of the parties and intervenors require us to address four issues: (1) as preliminary matters, (a) is the Executive Director's decision a final agency action over which we may exercise jurisdiction, and (b) if so, is it procedurally valid, such that we may reach the merits; (2) does the EAC have a nondiscretionary duty to approve the states' requests under the NVRA; (3) is the Executive Director's decision arbitrary and capricious; and (4) is the Executive Director's decision unconstitutional?

### A

At the outset, we must consider two broad issues: (1) whether the Executive Director's decision constituted final agency action; and (2) if so, whether the Executive Director's decision was procedurally valid.

**1**

We must first determine whether the Executive Director's decision constituted final agency action, a question that necessarily implicates our own jurisdiction. The APA authorizes judicial review only of final agency actions. Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 61-62 (2004). "[T]o be final, agency action must mark the consummation of the agency's decisionmaking process, and must either determine rights or obligations or occasion legal consequences." Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 483 (2004) (quotations omitted).

There is a "presumption in favor of judicial review of administrative action." Block v. Cmty. Nutrition Inst., 467 U.S. 340, 348 (1984); accord Painter v. Shalala, 97 F.3d 1351, 1356 (10th Cir. 1996). Additionally, we construe the concept of final agency action pragmatically, rather than inflexibly. Abbott Labs. v. Gardner, 387 U.S. 136, 149-50 (1967); Coal. for Sustainable Res., Inc. v. U.S. Forest Serv., 259 F.3d 1244, 1251 (10th Cir. 2001); Sierra Club v. Yeutter, 911 F.2d 1405, 1417 (10th Cir. 1990). Even if "the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior [could] belie[] the claim that its interpretation is not final." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 479 (2001).

An agency cannot render its action final merely by styling it as such. See, e.g.,

8

Cody Labs., Inc. v. Sebelius, 446 F. App'x 964, 968 (10th Cir. 2011) (unpublished) (noting that the "label an agency attaches to its action is not determinative") (quoting Cont'l Air Lines, Inc. v. Civil Aeronautics Bd., 522 F.2d 107, 124 (D.C. Cir. 1975) (en banc)). Generally, the decision of a subordinate is not final action. See Abbott Labs., 387 U.S. at 151. However, we conclude that, under the unique circumstances of this case, the Executive Director's decision—which was issued pursuant to a subdelegation of authority in a 2008 policy—was final.

## 2

On September 12, 2008, the EAC commissioners subdelegated several responsibilities to the Executive Director, including the responsibility to "[m]aintain the Federal Voter Registration Form consistent with the NVRA and EAC Regulations and policies," in its Roles and Responsibilities Policy. The subdelegated responsibilities also included, inter alia, the responsibilities to "[m]anage the daily operations of EAC consistent with Federal statutes, regulations and EAC policies;" "[i]mplement and interpret policy directives, regulations, guidance, guidelines, manuals and other policies of general applicability issued by the commissioners;" and "[a]nswer questions from stakeholders regarding the application of NVRA or HAVA [the Help America Vote Act] consistent with EAC's published Guidance, regulations, advisories and policy[.]"

We owe deference to the EAC's interpretation of the statute it was charged with administering when it issued this policy, and to its conclusion that HAVA, the EAC's

9

enabling statute,[1] permitted the Executive Director to issue decisions on behalf of the agency in maintaining the Federal Form. See City of Arlington v. FCC, 133 S. Ct. 1863, 1870-71 (2013) (deference extends to an agency's interpretation of the scope of its own authority under a statute). "[W]e apply Chevron deference to the [agency]'s interpretation of the statute and its own authority." In re FCC 11-161, 753 F.3d 1015, 1114 (10th Cir. 2014). This level of deference requires us to "decide 'whether the agency's answer is based on a permissible construction of the statute.'" Id. (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)).

Absent some indication in an agency's enabling statute that subdelegation is forbidden, subdelegation to subordinate personnel within the agency is generally permitted. Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 121 (1947).[2] Our sibling circuits that have spoken on this issue are unanimous in permitting subdelegations to subordinates, even where the enabling statute is silent, so long as the enabling statute and its legislative history do not indicate a prohibition on subdelegation. See La. Forestry Ass'n, Inc. v. Sec'y U.S. Dep't of Labor, 745 F.3d 653, 671 (3d Cir. 2014); Frankl v. HTH Corp., 650 F.3d 1334, 1350 (9th Cir. 2011) (noting the "general presumption that delegations to subordinates are permissible in cases of statutory silence"); U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004), cert. denied,

_____

[1] See Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 ("HAVA") (transferring voter-registration functions to the EAC).
[2] Fleming was not the first case in which the Supreme Court reached this well-established conclusion. See, e.g., Parish v. United States, 100 U.S. 500, 504 (1879).

10

125 S. Ct. 345 (2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent."); United States v. Mango, 199 F.3d 85, 91-92 (2d Cir. 1999); House v. S. Stevedoring Co., 703 F.2d 87, 88 (4th Cir. 1983); United States v. Gordon, 580 F.2d 827, 840 n.6 (5th Cir. 1978); United States v. Vivian, 224 F.2d 53, 55-56 (7th Cir. 1955) (in dicta).[3]

Because the text of HAVA, the EAC's enabling statute, neither explicitly permits nor forbids subdelegation, subdelegation is presumed permissible. HAVA provides for an Executive Director, a General Counsel, and other staff, 52 U.S.C. § 20924, indicating that Congress contemplated some degree of subdelegation to those staff members. Cf. Norman v. United States, 392 F.2d 255, 263 (Ct. Cl. 1968) (noting that Congress' authorization of a staff to assist the Secretary of the Air Force supports the conclusion that the Secretary could subdelegate his duties).

Further, in NLRB v. Duval Jewelry Co. of Miami, 357 U.S. 1, 7 (1958), the Court held that the "limited nature of the delegated authority" exercised by a subordinate

---

[3] See also Jason Marisam, Duplicative Delegations, 63 Admin. L. Rev. 181, 241 (2011) (noting that the Supreme Court has held that "the power to subdelegate was presumed when Congress was silent on whether subdelegation was allowed," and that subdelegation to subordinates has become uncontroversial in the modern day); cf. United States v. Widdowson, 916 F.2d 587, 592 (10th Cir. 1990), vacated on other grounds, 502 U.S. 801, 801 (1991) (explaining that the "relevant inquiry in any subdelegation challenge is whether Congress intended to permit the delegate to subdelegate the authority conferred by Congress[,]" and that language in the statute at issue allowing the Attorney General to authorize staff to carry out his duties implied such an intent).

11

official justifies upholding a delegation to such an official.[4] The 2008 subdelegation before us specifies the authority granted to the Executive Director and the manner in which it is to be exercised. It is not a subdelegation of the entirety of the superior's power. Accordingly, we do not discern any problem with the EAC's determination in 2008 that HAVA permitted a limited subdelegation of decisionmaking authority regarding the maintenance of the Federal Form to the Executive Director. In other words, we conclude that the EAC's decision amounted to a reasonable interpretation of the scope of its authority under HAVA, and we accord that interpretation Chevron deference.

The key inquiry then involves what kind of questions the Executive Director is authorized to decide in maintaining the Federal Form. As relevant here, the EAC argues that the 2008 subdelegation permits the Executive Director to give effect to existing EAC precedent in maintaining the Federal Form by making decisions concerning the contents of the Federal Form. Specifically, the EAC contends that the Executive Director was subdelegated the authority to make decisions regarding state requests to modify the contents of the Federal Form. We agree. The authority to make decisions concerning the maintenance of the Federal Form naturally includes the authority to make decisions concerning the contents of the Federal Form. Indeed, although the states vigorously contend that the Executive Director does not have discretion to deny their requests to

---

[4] See also Note, Subdelegation by Federal Administrative Agencies, 12 Stan. L. Rev. 808, 816 (1960) ("[A] court should inquire into the extent of the particular subdelegation since the narrower the area of judgment left to the subordinate, the less objectionable the subdelegation should be.")

modify the contents of the Federal Form and that her denial of their requests is not procedurally valid due to the EAC's lack of a quorum—matters we address infra—they do not seem to dispute the notion that the Executive Director is properly vested through a subdelegation from the EAC with responsibility to make decisions (even if only of a provisional and ministerial sort) regarding the contents of the Federal Form. However, important procedural issues remain regarding whether the Executive Director's decision here—with respect to the states' requests to modify the contents of the Federal Form—constitutes final agency action; and, if so, whether that decision is procedurally valid.

**3**

By the time the Executive Director issued her decision purporting to act on the agency's behalf, the EAC lacked a quorum of Commissioners. This lack of a quorum rendered further review of the Executive Director's decision by the EAC Commissioners impracticable.[5] Thus, under the unique circumstances of this case, the Executive Director's decision concerning the states' requests to modify the contents of the Federal Form consummated the agency's decisionmaking process and constituted final agency action. And, because the Executive Director's decision was effectively the last word of the agency, it imposed legal consequences that were not provisional: namely, the decision resulted in the exclusion of the states' requested language from the Federal Form.

---

[5] We recognize that some might find the practical unavailability of further agency review because of the absence of a quorum troubling on due-process or related grounds. However, the states have waived any such arguments by failing to advance them in their appellate briefing.

In Teamsters Local Union No. 455 v. NLRB, 765 F.3d 1198, 1200-01 (10th Cir. 2014), we concluded that the finality of an agency action turns in part on "whether the action's impact is direct and immediate." Id. at 1201 (quotations omitted). We reasoned that, despite questions about the agency action's procedural validity that stemmed from the agency board's composition, the action was final and reviewable because it "denied the union's requested relief, marked the end of the road for the agency's consideration of the issue, and purported to decide the union's rights under the [statute]. The order could be invalid and issued without authority, but none of that would destroy our jurisdiction to hear the case." Id.; see also George Hyman Constr. Co. v. Occupational Safety & Health Review Comm'n, 582 F.2d 834, 837 (4th Cir. 1978) (holding that a commission's lack of a quorum does not render their delegee's order unappealable, because "[u]nless the order is appealable the employer is placed in a jurisdictional limbo that would prevent him from seeking judicial relief from a possibly erroneous decision"); Marshall v. Sun Petroleum Prods. Co., 622 F.2d 1176, 1179-80 (3d Cir. 1980) (reaching the same conclusion).

Guided by Teamsters, we conclude that the lack of a quorum in January 2014—though presenting a colorable question regarding the procedural validity of the Executive Director's decision, which we address infra—does not affect the finality of that decision. As in Teamsters, the decision had "direct and immediate" impact, because as soon as it was issued, it denied Kobach's and Bennett's requests to modify the Federal Form. It also marked the end of the agency's consideration of the issue and purported to decide

14

the parties' rights under the NVRA. The Executive Director's decision therefore constitutes a final order, notwithstanding a subsequent lack of quorum, and we thus have jurisdiction under the APA to review it.

**4**

Finally, we assess the procedural validity of the Executive Director's decision. Kobach and Bennett argue that 52 U.S.C. § 20928's requirement that "[a]ny action which the Commission is authorized to carry out under this chapter may be carried out only with the approval of at least three of its members" renders the Executive Director's decision ultra vires because it was not approved by three commissioners. But because the decision is consistent with and relies in substantial part upon the EAC's established policies, it falls within the scope of the 2008 subdelegation, which was approved by three commissioners. Moreover, § 20928 explicitly applies only to actions authorized in the same chapter. The decision at issue in this case was authorized by 52 U.S.C. § 20508, which was contained in a different chapter of the Code when § 20928 was passed.

Moreover, because the 2008 delegation only passes limited authority to a subordinate outside the delegating group, it grants the Executive Director powers that survive the later loss of a quorum of commissioners. In New Process Steel, L.P. v. NLRB, 560 U.S. 674, 676 (2010), the Supreme Court invalidated actions taken by two members of the National Labor Relations Board ("NLRB") when the statute required a quorum of at least three members to be present. However, the Court stated that its decision "does not cast doubt on the prior delegations of authority to nongroup members,

15

such as the regional directors or the general counsel." Id. at 684 n.4.  The Court

explicitly noted that "we do not adopt the District of Columbia Circuit's equation of a

quorum requirement with a membership requirement that must be satisfied or else the

power of any entity to which the Board has delegated authority is suspended." Id. (citing

Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB, 564 F.3d 469, 475 (D.C. Cir.

2009)).  All other circuits to consider the issue have rejected Laurel Baye and allowed

delegations to nongroup members to survive loss of a quorum.  Kreisberg v.

HealthBridge Mgmt., LLC, 732 F.3d 131, 140 (2d Cir. 2013); Frankl, 650 F.3d at 1354;

Osthus v. Whitesell Corp., 639 F.3d 841, 844 (8th Cir. 2011); Overstreet v. El Paso

Disposal, L.P., 625 F.3d 844, 852-854 (5th Cir. 2010).

The 2008 subdelegation parallels the "prior delegations of authority to nongroup

members" that New Process Steel distinguished from the broad intra-group delegation

struck down in that case.  560 U.S. at 684 n.4.  In New Process Steel, the Court

invalidated a redelegation of "all of the Board's power" by a quorum of commissioners to

a subgroup of two commissioners in anticipation of impending loss of a quorum.  Id. at

677.  The Court repeatedly emphasized that the power the subgroup had attempted to

exercise was the full power of the agency.  See 560 U.S. at 681 (noting the "command

implicit in both the delegation clause and in the Board quorum requirement that the

Board's full power be vested in no fewer than three members") (emphasis added); id. at

688 ("Congress' decision to require that the Board's full power be delegated to no fewer

than three members, and to provide for a Board quorum of three, must be given practical

16

effect rather than swept aside in the face of admittedly difficult circumstances.")

(emphasis added).

In contrast, the 2008 subdelegation did not transfer the Commissioners' full power.[6] Rather, it instructed the Executive Director to continue maintaining the Federal Form consistent with the Commissioners' past directives unless and until those directions were countermanded. The 2008 subdelegation therefore did not raise the specter of New Process Steel's "tail that would not only wag the dog, but would continue to wag after the dog died." Id. A more apposite analogy for this case would be the faithful servant who continues to follow his master's orders even while his master is absent.

Our decision in Perlmutter v. Commissioner, 373 F.2d 45 (10th Cir. 1967), further supports our conclusion. In Perlmutter, we upheld an agency regulation authorizing the Commissioner of Internal Revenue to "redelegate authority to perform functions, including issuance of deficiency notices, to other officers or employees under his

---

[6] The limited, rather than plenary, nature of the 2008 subdelegation might appear to undermine its ability to support the issuance of a final decision even while it supports that decision's validity. However, had the subdelegation not authorized a final agency action, no amount of remonstration from the district court could have compelled the EAC to issue what would have necessarily been an ultra vires action. Nor would the EAC's choice to wait for a quorum to be reestablished necessarily have constituted unreasonable delay. See Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (five year delay not unreasonable for an understaffed agency); see also Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999) (absent a statutory deadline for agency action, courts retain "the discretion to decide whether agency delay is unreasonable"). Certainly, the EAC's lack of quorum would not subject it to a ministerial duty to grant whatever requests states make, just as a court lacking a quorum would not acquire a ministerial duty to grant all motions advanced by litigants.

17

supervision and control." Id. at 46 (quotations omitted). Perlmutter noted that "[f]rom a practical standpoint, the office of District Director cannot cease operating because of the Director's illness." Id. Similarly, it would be impractical to simply shutter the EAC while it lacks a quorum. Kobach and Bennett essentially concede as much by asking the EAC to modify the Federal Form to include their requested text despite its lack of a quorum.

In sum, we conclude that the Executive Director's decision is not only a final agency action, but also a procedurally valid action. Having determined that the Executive Director's decision is reviewable and procedurally sound, we proceed to its merits.

**B**

According to the district court's interpretation of the NVRA, the EAC lacks discretion to determine what information is "necessary" for state officials to assess an applicant's eligibility to vote. Under this reasoning, the EAC has a nondiscretionary duty to approve state requests to include state voter qualifications on the Federal Form. Exhaustive examination of the NVRA by the ITCA Court, however, is dispositive of that issue. We are compelled by ITCA to conclude that the NVRA preempts Arizona's and Kansas' state laws insofar as they require Federal Form applicants to provide documentary evidence of citizenship to vote in federal elections. Accordingly, we hold that the EAC is not compulsorily mandated to approve state-requested changes to the Federal Form.

18

In ITCA, the Supreme Court considered "whether the [NVRA's] requirement that States 'accept and use' the Federal Form pre-empts Arizona's state-law requirement that officials 'reject' the application of a prospective voter who submits a completed Federal Form unaccompanied by documentary evidence of citizenship." 133 S. Ct. at 2253. It answered that question in the affirmative. Id. at 2260.

The Court expressly rejected the argument that states have exclusive authority to regulate elections under the Elections Clause, U.S. Const. Art. I. § 4, cl. 1. ITCA, 133 S. Ct. at 2257. Instead, the Court reaffirmed its precedent interpreting the Elections Clause to permit federal regulation of federal elections. Id. at 2253. "The Clause's substantive scope is broad. 'Times, Places, and Manner,' we have written, are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections,' including, as relevant here and as petitioners do not contest, regulations relating to 'registration.'" Id. (quoting Smiley v. Holm, 285 U.S. 355, 366 (1932)).

Turning to the text of the NVRA, the Court "conclude[d] that the fairest reading of the statute is that a state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form." Id. at 2257.[7] In particular, the Court noted that permitting such state

---

[7] The NVRA's legislative history, although the Court did not examine it, provides additional support to the Court's interpretation. Both houses of Congress debated and voted on the specific question of whether to permit states to require documentary proof of citizenship in connection with the Federal Form, and ultimately rejected such a proposal. See S. Rep. No. 103-6, at 11 (1993) (concluding that attestation under penalty of perjury

Continued . . .

19

alterations threatened to eviscerate the Form's purpose of "increas[ing] the number of eligible citizens who register to vote." Id. at 2256 (quoting 42 U.S.C. § 1973gg(b)). "Arizona's reading would permit a State to demand of Federal Form applicants every additional piece of information the State requires on its state-specific form. If that is so, the Federal Form ceases to perform any meaningful function. . . ." Id. Additionally, the Court observed that when Congress acts pursuant to the Elections Clause, courts should not assume reluctance to preempt state law. Id. at 2257. The Court therefore held that "42 U.S.C. § 1973gg-4 precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself." Id. at 2260.

Even as the ITCA Court reaffirmed that the United States has authority under the Elections Clause to set procedural requirements for registering to vote in federal elections (i.e., that documentary evidence of citizenship may not be required), it noted that individual states retain the power to set substantive voter qualifications (i.e., that voters be citizens).[8] See id. at 2257-58. "The Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them." Id. at 2257. In ITCA, the

and criminal penalties are "sufficient safeguards to prevent noncitizens from registering to vote"); 139 Cong. Rec. S2091 (1993) (proposing amendment that would allow states to require documentary proof of citizenship for registration); H.R. Rep. No. 103-66, at 23-24 (1993) (Conf. Rep.) (rejecting amendment); 139 Cong. Rec. H2269, 2274-76 (1993) (deciding not to overturn Conference Committee's rejection of the amendment).

[8] That federal authority to establish procedural rules can coexist with state authority to define substantive rights is familiar from other contexts, such as the federal rules of civil procedure. See, e.g., Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co., 559 U.S. 393, 407 (2010); Lujan v. Regents of Univ. of Cal., 69 F.3d 1511, 1516 (10th Cir. 1995).

Court explains that if federal enactments "precluded a State from obtaining information necessary for enforcement," this "would raise serious constitutional doubts." Id. at 2258-59. The Court did not have to resolve this potential constitutional question in ITCA, nor did it employ canons of statutory construction to avoid it, because such steps would only be necessary if Arizona could prove that federal requirements precluded it from obtaining information necessary to enforce its qualifications.

To prove preclusion, said the Court, "a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility," and "may challenge the EAC's rejection of that request in a suit under the [APA]." Id. at 2259.[9] The Court's ruling would make no sense if the EAC's duty was nondiscretionary. "Arizona would have the opportunity to establish in a reviewing court that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include Arizona's concrete evidence requirement on the Federal Form." Id. at 2260. This framework makes neither the states nor the EAC exclusive arbiters of whether a procedural requirement precludes the enforcement of a voter qualification. Rather, each must support its position with evidence that will survive the evaluation of a reviewing court. Under the Court's approach, the EAC has a duty to

---

[9] In context, the ITCA opinion's reference to "the EAC's inaction" as the trigger for APA review uses the term "inaction" to encompass the EAC's denial of a state's request as well as the EAC's refusal to issue a final agency action at all. The opinion characterizes the EAC's 2006 denial of Arizona's request as an "agency action (or rather inaction)." ITCA, at 2260.

21

include a state's requested text on the Federal Form only if a reviewing court holds, after conducting APA review, that excluding the requested text would preclude the state from enforcing its voter qualifications.

By contrast, the district court held that the states' averment that their requested text is necessary for enforcement was, on its own, sufficient to impose a nondiscretionary duty on the EAC. Kobach v. U.S. Election Assistance Comm'n, No. 13-CV-4095-EFM-TJJ, 2014 WL 1094957, at *12 (D. Kan. Mar. 19, 2014) ("[T]he states' determination that a mere oath is not sufficient is all the states are required to establish."). This holding is inconsistent with the Supreme Court's statements that states must "request" (rather than direct) the EAC to include the requested text, and must "establish" (rather than merely aver) their need for it. See ITCA, 133 S. Ct. at 2259-60. Moreover, the Court explained that states may "assert . . . that it would be arbitrary for the EAC to refuse to include" a requested instruction, and support that assertion by comparison with other EAC decisions. Id. at 2260. Were a state's mere averments truly sufficient to obligate the EAC to grant its requests, there would be no need for states to advance and substantiate an argument that their requests had been arbitrarily refused.

We accordingly conclude that the district court incorrectly interpreted the NVRA as subjecting the EAC to a nondiscretionary duty to approve state requests. The EAC does have discretion to reject such requests, subject to judicial review of its decisions under the APA.

**C**

22

Next, we hold that the Executive Director's decision to reject the states' request was a consistent and valid exercise of limited subdelegated authority. Kobach and Bennett have thus failed to carry the burden ITCA establishes for them: to convince a court conducting APA review that the denial of their request precluded them from obtaining information that is "necessary" to enforce their respective states' voter qualifications. See 133 S. Ct. at 2260.

The Executive Director's decision was an informal adjudication carried out pursuant to 5 U.S.C. § 555.[10] An informal adjudication must be reversed if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); City of Colo. Springs v. Solis, 589 F.3d 1121, 1131, 1134 (10th Cir. 2009). This standard of review is "very deferential" to the agency's determination, and a presumption of validity attaches to the agency action such that the burden of proof rests with the party challenging it. W. Watersheds Project v. Bureau of Land Mgmt., 721 F.3d 1264, 1273 (10th Cir. 2013); accord Aviva Life & Annuity Co. v. FDIC, 654 F.3d 1129, 1131 (10th Cir. 2011); Ecology Ctr., Inc. v. U.S. Forest Serv., 451 F.3d 1183, 1188 (10th Cir. 2006). A court applying the arbitrary-and-capricious standard of review must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Aviva Life, 654 F.3d at

---

[10] Unless a statute requires otherwise, agencies have "flexibility" to decide that a full evidentiary hearing is unnecessary in an informal adjudication. Cascade Natural Gas Corp. v. FERC, 955 F.2d 1412, 1425-26 (10th Cir. 1992).

1131.[11]

Although Kobach and Bennett complain that the Executive Director did not apply a particular standard of proof, they misunderstand the nature of informal adjudications. When an agency undertakes an informal adjudication, we require only that "the grounds upon which the agency acted . . . be clearly disclosed in, and sustained by, the record." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994). The Executive Director's detailed memorandum clearly discloses the grounds for its decision.

Kobach and Bennett also charge that the Executive Director did not accurately evaluate the evidence before her. We disagree. The Executive Director supported her conclusion in detail with evidence in the record, rationally connected that evidence to the conclusions that she drew, and was fully consistent with the EAC's own regulations and prior reasonable interpretation of the NVRA in its 2006 response to Arizona. Specifically, the Executive Director's decision discussed in significant detail no fewer than five alternatives to requiring documentary evidence of citizenship that states can use to ensure that noncitizens do not register using the Federal Form. Kobach and Bennett do

---

[11] Some amici contend that the Executive Director's decision should be subject to de novo review in its entirety, but Kobach and Bennett propose de novo review only for constitutional disputes. Their briefs argue that the decision should be reversed as arbitrary and capricious, not that this court should engage in de novo review of the factual basis for that decision. Accordingly, we review the decision under the arbitrary-and-capricious standard. Arbitrary-and-capricious review would be appropriate even had the EAC's lack of a quorum rendered the Executive Director's decision procedurally suspect. See Teamsters, 765 F.3d at 1204-05 (applying arbitrary-and-capricious review to NLRB decision made without a quorum).

not dispute that these means exist, and merely contend that they are overly onerous. But, in ITCA, the Court stated that the states must carry their burden "to establish in a reviewing court that a mere oath will not suffice." ITCA, 133 S. Ct. at 2260. Generalized complaints that the memorandum's suggested approaches present logistical difficulties do not meet ITCA's standard.

The states have failed to meet their evidentiary burden of proving that they cannot enforce their voter qualifications because a substantial number of noncitizens have successfully registered using the Federal Form. Nor do they raise the argument that the Court suggested states might offer as part of an APA challenge: that the denial of their request was inconsistent with the EAC's granting other states' requests. Id. Even if we credited all of Kobach's and Bennett's criticisms of the Executive Director's decision, the states simply did not provide the EAC enough factual evidence to support their preferred outcome.

Moreover, had the EAC accepted the states' requests, it would have risked arbitrariness, because Kobach and Bennett offered little evidence that was not already offered in Arizona's 2005 request, which the EAC rejected. Changing course and acceding to their requests absent relevant new facts would conflict with the EAC's earlier decision. See In re FCC 11-161, 753 F.3d at 1142 (noting that "[t]he arbitrary-and-capricious standard requires an agency to provide an adequate explanation to justify treating similarly situated parties differently" (quotation omitted)); see also Eagle Broad. Grp., Ltd. v. FCC, 563 F.3d 543, 551 (D.C. Cir. 2009) (observing that "an agency may

25

not treat like cases differently" and that "an agency's unexplained departure from precedent must be overturned as arbitrary and capricious" (citations omitted)).

## D

Finally, we consider the states' constitutional claims. Kobach and Bennett argue that the EAC's denial creates an unconstitutional preclearance regime. See Shelby Cnty. v. Holder, 133 S. Ct. 2612, 2631 (2013). They also argue that states' constitutional powers to enforce voter qualifications trump Congress' Elections Clause power to enact regulations governing the procedures for federal elections.

## 1

Unlike the statute at issue in Shelby County, the NVRA does not require preclearance of state election laws. Cf. id. at 2624. Instead, the NVRA establishes that the Federal Form for voter registration can only be modified by the federal government, not directly by states, and that states must "accept and use" the Federal Form to register voters for federal elections. See ITCA, 133 S. Ct. at 2259. The NVRA therefore leaves Arizona and Kansas free to choose whether to impose a documentary evidence of citizenship requirement on voters in state elections.[12]

Accordingly, Shelby County does not cast doubt on the NVRA's constitutionality

---

[12] Whether Kansas' or Arizona's own constitutions permit this requirement is not before us in this case. See Belenky v. Kobach, 13-4150-EFM-KMH, 2014 WL 1374048, at *4 (D. Kan. Apr. 8, 2014) (unpublished) (remanding to state court a lawsuit alleging that Kansas's imposition of proof-of-citizenship requirements on registrants using the state form violates the Kansas constitution and Kansas statutes).

26

as interpreted in <u>ITCA</u>.  Rather, <u>Shelby County</u> cites <u>ITCA</u> for the proposition that the federal government retains "significant control over federal elections."  <u>Shelby County</u>, 133 S. Ct. at 2623.[13]  Far from undermining <u>ITCA</u>, <u>Shelby County</u> reaffirms its core holding.

**2**

Kobach's and Bennett's argument that the states' Qualifications Clause powers trump Congress' Elections Clause powers is foreclosed by precedent.  In <u>ITCA</u>, the Court clearly held that Congress' Elections Clause powers preempt state laws governing the "Times, Places and Manner" of federal elections, including voter registration laws.  133 S. Ct. at 2253.  Citing the <u>Federalist Papers</u>, the Court noted that the Framers expressly rejected giving the states exclusive authority to regulate federal elections because "an exclusive power of regulating elections for the national government, in the hands of the State legislatures, would leave the existence of the Union entirely at their mercy."  <u>Id.</u>[14] Only the dissenting opinion by Justice Thomas endorses the theory that Arizona and Kansas press before this court.  <u>Id.</u> at 2266-69 (Thomas, J., dissenting).  The dissent proves the point.

---

[13] <u>Shelby County</u> signals unanimous support for this proposition.  The four dissenters regarded <u>ITCA</u> as consistent with their claim that "Congress holds the lead rein in making the right to vote equally real for all U.S. citizens."  <u>Shelby County</u>, 133 S. Ct. at 2637 n.2 (Ginsburg, J., dissenting).

[14] In <u>ITCA</u>, the Court noted that this "prospect seems fanciful today."  133 S. Ct. at 2253.  But during oral argument in the district court, the states took the position that there were no limits on their ability to include requirements on the Federal Form so long as those requirements reflected valid state law enactments.

27

With the Supreme Court's recent precedent squarely against their position, we cannot accept Kobach's and Bennett's contention that states' Qualifications Clause powers trump Congress' Elections Clause powers. Nor can we credit their contention that the EAC's refusal to modify the Federal Form unconstitutionally precludes them from enforcing their laws intended to prevent noncitizen voting. As discussed in Section II.C, supra, there are at least five alternate means available to the states to enforce their laws, and they have not provided substantial evidence of noncitizens registering to vote using the Federal Form.

### III

In sum, the EAC had valid authority under HAVA to subdelegate decisionmaking authority to its Executive Director relating to the contents of the Federal Form. Under the unique circumstances of this case (involving a quorum-less EAC), an appeal from the Executive Director's decision to deny the states' requests to modify the contents of the Federal Form was impracticable. Consequently, the Executive Director's decision constitutes final agency action. And that action—which fell within the bounds of the subdelegation that the EAC issued when it had a quorum—was procedurally valid. Contrary to Kobach's and Bennett's claims, the NVRA does not impose a ministerial duty on the EAC to approve state requests to change the Federal Form. The Executive Director's denial of the states' requests survives our APA review, and the states' constitutional claims are unavailing. We therefore **REVERSE** the ruling of the district court and **REMAND** the case to the district court with instructions to vacate its order

28

instructing the EAC to modify the Federal Form.